Elton D. MARSH, Plaintiff-Appellee,

v.

GREYHOUND LINES, INC., and Western
Greyhound Pension Trust,
Defendants,

Western Greyhound Pension Trust,
Defendant-Appellant.

No. 73–2051.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1974.

Sam Sparks, John A. Grambling, El Paso, Tex., Stanley H. Neyhart, San Francisco, Cal., for defendant-appellant.

Jack L. Brewster, El Paso, Tex., for plaintiff-appellee.

Before BELL, DYER and CLARK, Circuit Judges.

BELL, Circuit Judge:

Appellee filed this diversity action claiming disability retirement benefits from appellant Pension Trust. The Trust provides various long term security benefits for employees of Greyhound Lines, Inc., and is governed by a Board of Trustees consisting equally of union and employer representatives. Appellee sought benefits under a provision allowing payments whenever an eligible employee becomes permanently physically disqualified from his particular job.[1]

For 22 years prior to March, 1968 appellee had been a bus driver for Greyhound. At that time he was in an accident which was entirely the fault of another driver. He did not return to duty as a bus driver, and shortly after the accident commenced work as an over-the-road tractor trailer driver. Subsequently he sought a disability pension, claiming that a hypertension problem had been so aggravated by the accident as to make driving passenger vehicles unbearable. This initial application was denied because of his failure to supply full medical information, particularly a specialist's examination normally required in the absence of an obvious disability. More than two years later, appellee again initiated claims procedures. He submitted reports of three specialists, plus that of his general practitioner. It was on the basis of the G.P.'s report that he held current Department of Transportation authorization to drive trucks in interstate commerce, despite the opinion of two of the specialists that he was disabled from all commercial

[1]. The pension plan also provides early and normal retirement benefits, as well as termination benefits. Since appellee has not reached the age for early or normal retirement, and since he has not been terminated as a Grayhound employee, he is at this time ineligible under either of these provisions.

driving. The Trustees again denied the application.

This appeal, from a judgment entered upon a jury verdict,[2] raises several issues justifying, in appellant's view, either a new trial or judgment in its favor. However, we need consider only one issue, that of the sufficiency of the evidence to support the jury's verdict. On this ground we reverse and direct the entry of judgment for appellant.

## I.

To decide this case we must determine the applicable legal standards for testing the Trust's liability, and must review the evidence on this issue in the light of the standard for directed verdicts.

Concerning the first question, we note that the Plan provides that "all decisions of the Trustees in administering the Plan shall be final." This provision of course will not be permitted to accord complete and unbridled discretion to the Trust. See e. g., Hainline v. General Motors Corp., 6 Cir., 1971, 444 F.2d 1250. However, Texas law, which governs this diversity case, is fairly clear that such a provision is to be given effect by requiring a showing of bad faith before the courts will interfere with a decision of the Trustees. *See* Neuhoff Bros. Packers Management Corp., v. Wilson, 1970, Tex., 453 S.W.2d 472. Appellee does not dispute that this is the applicable standard. However, he does contend that bad faith may be established not only by direct evidence, such as evidence of unreasonable requirements, refusal to consider favorable information, or the use of standards more strict than those applied to others similarly situated, but that bad faith may also be inferred from an adverse decision which has no basis in fact. Recognizing that direct evidence of bad faith could easily be concealed in the Trust's internal procedures and the Trustees' private opinions, we agree with appellee's interpretation.

The second element of the standard we must apply concerns the question of when a factual dispute should be submitted to a jury. In this regard we are of course constrained by Boeing Co. v. Shipman, 5 Cir., 1969, 411 F.2d 365 (en banc), which states:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury."

411 F.2d at 374.

Combining the standards of *Neuhoff* and *Boeing*, we conclude that our inquiry must be whether the evidence is such that reasonable men, considering all the evidence, could conclude that the Trustees acted in bad faith. Since we find no direct evidence of bad faith, our principal inquiry may be more narrowly defined as whether the evidence is such that reasonable men, considering all the evidence, could conclude that the Trustees' decision had no basis in fact. If the evidence so strongly and overwhelmingly supports the conclusion that the decision had a factual basis that reasonable men could not decide to the contrary, then appellant was entitled

2. Appellee also sought to recover from Greyhound for vacation or sick leave pay since the date of the accident, basing his claim on the fact that Greyhound had never discharged him. Judgment N.O.V. was entered for Greyhound, and appellee has not cross-appealed.

to a directed verdict. As already intimated, we are of the opinion that the evidence is of such a nature.

We base our conclusion on documentary evidence the validity and credibility of which is unchallenged, and rely both on appellee's persistent failure to provide medical evidence reasonably required by the Trustees, and on the fact that the medical evidence actually submitted to the Trust did not establish that appellee was permanently disabled.

## II.

The Plan clearly requires that a disability pension applicant "submit acceptable medical evidence of *permanent* physical disqualification from [his] job." (Emphasis added). Paragraph 7–A(6). The same Paragraph also states that, "Medical evidence submitted must be satisfactory to the Board of Trustees." Finally, Paragraph 20–A provides that:

"Each Employe and retired Employe shall furnish to the Board of Trustees any information or proof requested by it and reasonably required to administer the Pension Plan. Failure on the part of any Employe or Retired Employe to comply with such request promptly, completely and in good faith shall be sufficient grounds for denying, suspending or discontinuing benefits to such person."

Against this background we will review appellee's responses to the Trust's requests for information.

Appellee's initial application, in June, 1968, included a "Physician's Statement of Disability," on a form provided by the Trust, executed by appellee's family doctor, Dr. Goodloe. This statement contained a diagnosis of "hypertensive cardiovascular disease" and "anxiety neurosis," and stated that appellee was unable to work with the public and would never again be able to work for Greyhound. The Trust's Administrator, Bezore, notified appellee that this was "insufficient to establish permanent disqualification from employment as a bus driver." After a request for clarification from appellee's attorney, Bezore replied:

"We would suggest that we be furnished all objective tests reports and a statement from all doctors treating Mr. Marsh since 1962. If there is an absence of objective evidence of disability, we suggest a full report from another qualified expert, not a general practitioner, in the area of the particular illness upon which disqualification is being requested."

Appellee then supplied a statement by Dr. Goodloe that he had been seeing appellee "for elevated blood pressure since February, 1962," along with a report of his blood pressure on nine dates. No information about treatment or permanence was included, and there was no specialist's examination. Bezore replied that this did not "establish *permanent disqualification*," and offered to provide assistance upon request. Appellee through his attorney, then refused to supply additional information, on the grounds the text of the Plan did not specifically require a specialist's report. Shortly thereafter, in December, 1968, appellee's application was denied, for failure to comply with the Plan by refusing to supply reasonably requested information.

In January, 1971, appellee's attorney sought to submit a new application, and requested "comments and suggestions as to supporting documentation." Bezore responded with the following:

"Medical information should be current and should include a full report from a specialist covering history of the disability and all treatment, including dates, since last date of employment with Greyhound, physical findings, current diagnosis, clinical course and lab and x-ray course. The doctor need not confine his answer to the form provided but may attach his report to the form provided."

In submitting the renewed application, the medical form was not supplied; rather there was only a handwritten note

from a cardiologist stating that appellee "has ischemic heart disease and is not able to drive a public passenger vehicle." Bezore replied that:

"[The Trust needs a] *complete* medical report as outlined to you in . . our [earlier letter (quoted above)]. The simple one sentence statement from [the cardiologist] is inadequate for our requirements. We must have sufficient medical history and dates to enable our Medical Consultants to reach indpendently a conclusion that Mr. Marsh is permanently disqualified from his job."

Appellee then supplied the medical disability form, executed by the cardiologist. It repeated the diagnosis of ischemic heart disease, and stated that appellee was permanently disqualified from doing *any* work. However, it was based on a single examination, and gave no information as to treatment, progress or test results. Bezore replied to appellee's attorney:

"Surely you realize that medical information without a full report or detail and based on a single office visit over a 3½ year span is unsuitable for a board of Trustees to act favorably upon.

"The importance of detailed medical information should be doubly clear when the applicant has been performing work as physically demanding as a bus driver, since a few days after his last date of work as a bus driver.

.    .    .    .    .    .

"Furnish promptly a *full complete detailed* and *current* medical report from a specialist (2) copies of physical exam reports upon which is current . . . and previous [Department of Transportation interstate truck driver cards were] issued. (sic)

"We have been corresponding with you for over three years on this matter and have yet to be furnished anything resembling substantial evidence of *permanent disqualification* (emphasis added) from Mr. Marsh's job as a bus driver."

Subsequently, in February, 1972, appellee filed three medical reports. He submitted, first, a recent report from a cardiovascular specialist finding hypertension and arteriosclerosis, prescribing increase medication to reduce blood pressure, and stating that because of the additional medication appellee should drive neither buses nor commercial trucks; no information about permanence was included, nor was there any discussion, save for appellee's own statement of his symptoms, of the alleged neurosis which prevented him from driving buses but, in his own mind, not trucks. Second, appellee submitted a recent report of a neuropsychiatrist diagnosing him as suffering from "chronic anxiety reaction" and "post traumatic hypertension" ; however, the report contained little other than a restatement of appellee's complaints, was based on one office visit and apparently no testing, dealt not at all with either the permanence of the conditions or appropriate treatment, and did not state that appellee was unable to drive buses. Third, he filed a medical report submitted by Dr. Goodloe to the Department of Transportation, dated December 29, 1970; this report indicated that as of that date appellee had normal heart rate, rhythm and sounds, and lower blood pressure than at any time since 1965, and that he had never suffered from "cardiovascular disease," "psychoneurotic disorder," or "any other nervous disorder."

About three months later, without either additional requests for information or further explanation, the Trustees again denied appellee's application.

### III.

From this course of events we conclude that reasonable men must find bases in fact for two grounds for the Trustees' decision. The first ground is that appellee failed to supply information required by the Trustees, and thus violated the Plan's terms. In particular, the file is devoid of specialist's information about his alleged neurosis, save for a neuropsychiatrist's diagnosis unsup-

ported by tests or other objective medical data. Nowhere does the file disclose efforts to treat the neurosis, nor is there any medical evidence that it is permanent and not amenable to treatment. We think the file's weakness with regard to the alleged neurosis is particularly striking in light of the Trust's repeated requests for information establishing permanent disability, in light of the requests for a specialist's discussion of the history, treatment and prognosis of the disabling condition, and in light of the fact that it is only the alleged neurosis that woud justify the conclusion that appellee is disabled as a driver of buses but not of trucks.[3]

■ The second ground for denial which finds a factual basis in the material before the Trustees is the conclusion that appellee is not disabled. Even disregarding the contradictory report by Dr. Goodloe, the medical information establishes only that appellee suffers from a hypertension problem which, in the opinion of several doctors, should preclude him from driving any commercial vehicle. Even assuming that the reports establish a permanent cardiovascular defect, appellee by his own actions regularly belies these opinions, by driving heavy trucks. Further, as discussed above, the medical reports do not establish that appellee suffers from an additional permanent neurosis which prevents him from driving buses but not trucks.

In sum, the record establishes bases in fact for the Trustees' decision, such that bad faith may not be inferred from the fact that appellee's pension was denied.

### IV.

■ We now turn to two matters in the record which could be presented as direct evidence of bad faith. They are the facts that the Trust neither asked for additional specific information after receiving the three medical reports submitted in February, 1972, nor did it give reasons for its second denial of appellee's pension. We conclude that in light of the Trust's handling of this case since 1968, these facts without more do not constitute evidence on which reasonable men could conclude that it acted in bad faith. As has been described, appellee was informed on numerous occasions that his applicaion was inadequate and that he should submit a thorough and detailed specialist's report as to the nature and permanence of his disability, and as to treatments for it. We think that the extensive correspondence fairly put appellee on notice of what was required of him and in what ways his application as finally submitted was inadequate, especially inasmuch as he was represented by counsel. In any case, we do not have a situation in which an applicant inquired whether his application was adequate, or sought an explanation of a denial. In these circumstances we do not consider the Trust's failures to yet again request more information or to explain the denial to be evidence of bad faith.

### V.

■ Finally, we consider the nature of the information required by the Trust. If the requirements were unreasonable, appellee, under Paragraph 20–A, had no duty to satisfy them and their imposition might itself be evidence of bad faith. In this connection, we note that the Trustees were bound to protect all participants in the Plan against payments to unqualified persons. In these circumstances their insistence on extensive medical information, such that their own consultants could evaluate the alleged disability, was reasonable and prudent. The requirement that medical information be supplied by a

---

3. Without relying on this fact, we note that appellee also failed to submit adequate data about his income during the period for which he sought disability benefits. The Plan provides for a partial reduction of benefits for earnings above a certain level, and states that the computation will be made on a monthly basis. Despite the clear wording of the Plan, and despite requests by Bezore, appellee neither broke his earnings down by month nor suggested that he was unable to do so.

**284**

specialist is not unreasonable when objective evidence of a disability is not apparent to laymen, and since this requirement is normal in such cases, the Trust has not acted arbitrarily with regard to appellee. Finally, the requirement that a permanent disability be established is mandated by the Plan, which does not compensate for temporary disability. We conclude that the Trust's information requirements were justified, and while less information might have sufficed, the rigor of the requirements did not reach the level of bad faith.

In sum, appellee has presented no direct evidence of bad faith, and because of the clear evidence of a factual basis for the Trustee's decision a jury may not infer bad faith from the fact that the claim was denied. Thus appellant was entitled to judgment.

Reversed and remanded with direction that judgment be entered for appellant.