MONSANTO COMPANY, Petitioner,

v.

Kamel BOUSTANY, et al., Respondents.

No. 00–0037.

Supreme Court of Texas.

Argued Jan. 17, 2001.

Decided March 28, 2002.

Rehearing Overruled May 23, 2002.

14. 995 S.W.2d 668 (Tex.1999).

Joe W. Redden, Jr., Harry Paul Weitzel, Beck Redden & Secrest, Houston, David E. Keltner, Jose Henry Brantley & Keltner, Fort Worth, John R. Gilbert, Gilbert & Moore, Angleton, for petitioner.

Robert C. Hilliard, John T. Flood, Hilliard & Munoz, Roberta S. Dohse, Paul W. Nye, Chaves, Chaves Gonzales & Hoblit, Corpus Christi, Russell W. Heald, Hilliard

& Heald, Beaumont, Audrey Mullert Vicknair, Bracewell & Patterson, Corpus Christi, for respondents.

Justice OWEN delivered the opinion of the Court.

We grant the Respondents' motion for rehearing. We withdraw our opinion dated October 18, 2001, and substitute the following in its place.

In this case we are called upon to construe an employee incentive plan and related stock option certificates. We must determine whether "termination of employment" occurred within the meaning of the incentive plan when the parent company sold all the stock of its subsidiary to another company and the employees continued to work for the subsidiary. The trial court granted summary judgment for the parent company on all claims, which consisted of breach of contract, conversion, and fraud. The court of appeals reversed and remanded all claims to the trial court, concluding that no "termination of employment" had occurred. We hold that the incentive plan and stock option certificates are unambiguous and that a "termination of employment" occurred within the meaning of those agreements. We do not consider the conversion or fraud claims because Monsanto only briefed matters pertaining to the breach of contract claim in this Court. We therefore reverse the judgment of the court of appeals, render judgment for Monsanto Company on the breach of contract claim, and remand the conversion and fraud claims to the court of appeals.

I

Fisher Controls International, Inc. was a wholly-owned subsidiary of Monsanto Company. Monsanto granted Fisher employees options to purchase Monsanto's stock under a Management Incentive Plan as compensation for past performance and as an incentive to remain with the Monsanto family of companies and contribute to those companies' value and growth. Monsanto instituted three incentive plans while Fisher was its subsidiary: the Monsanto Management Incentive Plan of 1984, the Monsanto Management Incentive Plan of 1988/I, and the Monsanto Management Incentive Plan of 1988/II. The provisions at issue in each plan are essentially identical, and for purposes of this litigation, the parties have referred to them collectively as the "Management Incentive Plan." The employee stock options were governed by both the Management Incentive Plan (the "Plan") and by the terms and conditions printed on the back of the stock option certificates ("option certificates") issued under it. The option certificates expired ten years from the date they were granted or upon termination of employment, whichever occurred first. The option certificates say that "Termination of Employment" is defined by reference to the Plan. The Plan in turn defines "Termination of Employment" as "the discontinuance of employment of a Participant for any reason other than a transfer." The specific times within which options could be exercised after termination of employment were set forth in the option certificates and varied, depending on the reason for termination.

The options at issue were granted in February in each of the years 1989, 1990, 1991, and 1992. In October 1992, Monsanto sold all its stock in Fisher to Emerson Electric Company. The Fisher employees retained their positions with Fisher. Monsanto's Executive Compensation and Development Committee (the "compensation committee"), whom the Plan vested with the authority to administer and interpret the Plan, determined that the sale of Fisher constituted a "termination of employ-

ment" for purposes of exercising the Monsanto stock options. The compensation committee concluded that a provision in the option certificates requiring options to be exercised within three months after termination of employment by Monsanto and a subsidiary applied to the Fisher employees' 1989, 1990, and 1991 option certificates. The committee further concluded that the 1992 option certificates expired by their own terms because they could not be exercised until at least one year had passed after the date they were granted. Less than a year had passed between the date these certificates were granted in February 1992 and the sale of Fisher's stock in October 1992.

However, the market price of Monsanto's stock was lower than the price at which the 1990 and 1991 stock options could be exercised, which meant that the employees could not profitably exercise those options within the three-month window. The compensation committee decided to extend the time for Fisher employees to exercise those options an additional nine months, until September 30, 1993. Consequently, the employees were given one year after Monsanto sold Fisher to exercise their 1990 and 1991 stock options. None of the Fisher employees contested the compensation committee's determinations at that time. Monsanto's stock price rose above the 1990 and 1991 option prices within that one-year window, and Fisher employees had the opportunity to profitably exercise all of those options. Some did so.

The Fisher employees' options had prices ranging from $44.312 per share for the 1989 options to $67.125 per share for the 1992 options. During the year after Monsanto sold Fisher, Monsanto's stock price reached a high of $66.25. Monsanto's stock thereafter continued to increase in value. By 1996, four years after the sale of Fisher, Monsanto's stock had reached $159.25 per share. It was then that a number of Fisher employees attempted to exercise options to purchase Monsanto stock. Monsanto maintained that the options had expired and refused to honor them. In response, 110 Fisher employees sued Monsanto for breach of contract, conversion, and fraud, alleging that the sale of Fisher was not a termination of employment and that Monsanto's decision to eliminate or shorten the ten-year period within which Fisher employees contended that they could exercise their options was wrongful.

Monsanto moved for summary judgment, arguing primarily that: 1) the Plan and the option certificates were unambiguous, and that the sale of Fisher was a "Termination of Employment" within the meaning of those agreements; and 2) Delaware's three-year statute of limitations should apply to preclude all the employees' causes of action.

The trial court granted Monsanto's motion for summary judgment as to all the employees' claims without stating the grounds for its decision. The court of appeals reversed, holding that no termination of employment had occurred. 6 S.W.3d at 601. It reasoned that the employees had continuously been employed by Fisher, and that Monsanto could have included a "change-of-control-of-*subsidiary*" provision if it had intended for the sale of a subsidiary to constitute termination of employment. *Id.* (emphasis in original). The court of appeals also held that Texas's four-year statute of limitations applied, and it remanded all the employees' claims to the trial court. *Id.*

We hold that the sale of Fisher constituted a "Termination of Employment" within the meaning of the Plan and option certificates. We accordingly reverse the court of appeals' judgment with respect to

the breach of contract claim and render judgment for Monsanto on that cause of action. The merits of the conversion and fraud claims are not before this Court. Monsanto did argue that we should adopt section 142 of the Restatement (Second) of Conflict of Laws and apply Delaware's three-year statute of limitations rather than Texas's four-year statute. But Monsanto did not brief in this Court the substance of Delaware's three-year statute of limitations and whether it would bar conversion or fraud claims. We therefore do not consider whether Delaware's, as distinguished from Texas', statute of limitations should apply.

## II

■ Delaware law does govern our construction of the Plan and the option certificates. Both the Plan and the option certificates provide that Delaware law applies, and all parties concur in their briefing in this Court that Delaware law governs the interpretation of these agreements. We apply the law of the jurisdiction chosen by the parties if the particular issue is one that they could have resolved by explicit agreement. *De-Santis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–78 (Tex.1990) (citing RESTATE-MENT (SECOND) OF CONFLICT OF LAWS § 187). We said in *DeSantis* that parties are free to choose what jurisdiction's law will apply as long as that jurisdiction has a reasonable relationship to the contract and the parties' agreement does not "thwart or offend the public policy of the state the law of which ought otherwise to apply." *Id.* at 677. We know of no public policy in Texas that would be thwarted by allowing parties to agree to the terms and conditions under which stock options may be exercised or by allowing those parties to specify that Delaware law governs the interpretation of such an agree-

ment when the stock at issue is that of a Delaware corporation.

■ Delaware law sets forth familiar principles for construing written agreements. An agreement should be read as a whole in discerning the parties' intent and, if possible, interpreted to reconcile all of the provisions of the document. *Kaiser Alum. Corp. v. Matheson,* 681 A.2d 392, 395 (Del.1996). "If no ambiguity is present, the Court must give effect to the clear language of the Certificate." *Id.* (citing *Johnston v. Tally Ho, Inc.,* 303 A.2d 677, 679 (Del.Super.Ct.1973)). A contract is not ambiguous simply because the parties disagree about its meaning:

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992) (insurance contract). In this case, as in the context of the insurance contract under consideration in *Rhone–Poulenc,* "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."

*Id.*

■ Our task is to determine whether the sale of Fisher was "Termination of Employment" for Fisher employees as that term is used in the Plan and option certificates. We must also discern the meaning of "Subsidiary" when it is used in these agreements. As we shall see, these terms, as defined and used in the Plan and option certificates, are not reasonably susceptible to differing interpretations.

We begin with the option certificates. An option to purchase up to one-third of the shares on which the option was granted could be exercised on or after a certificate's first anniversary. On or after the second anniversary, an option could be exercised to purchase not more than an additional one-third of the shares. On or after the third anniversary, an option could be exercised as to all the optioned shares.

The option certificates provided that they expired on the earlier of the tenth anniversary of their grant or termination of employment. If employment were terminated by Monsanto and its subsidiaries, then all rights to purchase stock expired three months after termination, except for termination for cause, in which event any rights to purchase stock expired immediately:

> 3. Option Term. The Option term will expire at the end of the day next preceding ten years from the Option Grant Date (the "Fixed Termination Date"), or on Termination of Employment of the Optionee, whichever shall first occur, provided that, to the extent that the Option was exercisable on Termination of Employment, the Optionee ... may exercise the Option
>
> > (a) within three months thereafter (but no later than the Fixed Termination Date) if employment shall have been terminated by the Company and its Subsidiaries, except for

cause (as determined by the Committee in the sole but not unreasonable exercise of its judgment).[1]

The Fisher employees' rights to purchase Monsanto stock thus turn on the meaning of "Termination of Employment." The option certificates direct that "Termination of Employment" "shall have the meaning set forth in the Plan."

The Plan says that "Termination of Employment" means "the discontinuance of employment of a *Participant* for any reason other than a Transfer." (Emphasis added.) The Plan defines "Participant" as "an *Eligible Participant* to whom a Stock Option has been granted." (Emphasis added.) "Eligible Participants" are defined by the Plan as "any employee of the Company, a Subsidiary or an Associated Company." Accordingly, whether there was a "termination of employment" of Fisher employees when Fisher's stock was sold depends on whether Fisher employees continued to be employees of a "Subsidiary" within the meaning of the Plan.

Importantly, the Plan defines "Subsidiary" in two different ways, depending on whether the employee held a Non–Qualified Stock Option or an Incentive Stock Option. For an employee who holds an Incentive Stock Option, the Plan says that whether a company is a subsidiary is determined by the company's status *at the time the option is granted*.[2] That is not

---

1. In this regard, the Plan provided:

    The Option may be exercised in full or in part from time to time within ten (10) years and thirty (30) days from the date of the grant, or such shorter period as may be specified by the Committee in the grant, provided that in any event each shall lapse and cease to be exercisable upon, or within such period following, Termination of Employment as shall have been determined by the Committee and as specified in the Option; provided, however, that such period following Termination of Employment shall

not exceed twelve months unless employment shall have terminated [as a result of retirement or death].

2. The Plan defines "Subsidiary" as follows:

    "Subsidiary" means: (i) for the purpose of an Incentive Stock Option, any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if, at the time of the granting of the Option, each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more

the case for employees, like Fisher employees, who hold Non–Qualified Stock Options. For the latter option holders, "Subsidiary" means a company in which Monsanto owns fifty percent or more of the shares of stock entitled to vote. The distinction is important. If the options granted to Fisher employees had been Incentive Stock Options, the employees would fall within the definition of "Eligible Participant" because they were employees of a company in which Monsanto owned fifty percent of the voting stock "at the time of the granting of the Option." The Plan contemplates that employees holding Non Qualified Stock Options are treated differently. They cease to be employees of a "Subsidiary" when Monsanto ceases to own fifty percent or more of their employer's voting stock.

The change in Fisher's stock ownership did not fall within the exception for a "Transfer" within the meaning of the Plan. "Transfer" for the purpose of a Non–Qualified Stock Option is defined by the Plan as "a change of employment of a Participant within the group consisting of the Company and its Subsidiaries." There was no "transfer" because there was no "change of employment." The Fisher employees continued to work for Fisher. But even assuming that there had been a "change in employment," it was not "within the group consisting of the Company and its Subsidiaries." Fisher was no longer a "Subsidiary" as defined by the Plan. In sum, a "Termination of Employment" occurred when Fisher's stock was sold by Monsanto.

The Fisher employees assert that the Plan ceased to govern their rights once they became "Optionees" within the meaning of the option certificates. They contend that the certificates alone govern the exercise of their options. They point out that the certificates do not mention the term "Eligible Participant." The certificates instead speak in terms of "Termination of Employment of the Optionee." The Fisher employees reason that once they became an Optionee, the definition of "Eligible Participant" in the Plan has no significance. We disagree.

Each option certificate says on its face that the grant of stock options is "pursuant to and subject to the provisions of the Monsanto Management Incentive Plan." As noted above, the option certificates also expressly provide that the terms "Transfer" and "Termination of Employment" when used in the certificates "shall have the meanings set forth in the Plan." There is no basis for reading "Eligible Participant" out of the Plan or its definition of "Termination of Employment."

■ The Fisher employees argue that because the option certificates contain a "Change of Control" provision that addresses a change in control of Monsanto, the parties did not intend for a change in control of a subsidiary to have any consequences for the subsidiary's employees. The option certificates' terms do not support this assertion. The change in control provision merely provides that if there is a change in control of Monsanto, stock options can be exercised without regard to limitations in the option certificate on how many shares of Monsanto stock the employee could purchase within the first three years after the grant of the option.

of the total combined voting power of all classes of stock in one of the other corporations in such chain; and (ii) for the purposes of a Non–Qualified Stock Option ..., any corporation (or partnership, joint venture, or other enterprise) of which the Company owns or controls, directly or indirectly, 50% or more of the outstanding shares of stock normally entitled to vote for the election of directors (or comparable equity participation and voting power).

The change of control provision understandably does not give employees of a subsidiary the right to accelerate the time within which they can purchase Monsanto stock if the subsidiary is sold. The change in control provision was not intended to and does not govern what happens when Monsanto divests a subsidiary. That eventuality is governed by the Plan and by the "Option Term" provision of the option certificates.

Monsanto has argued in the alternative that this Court need not construe the Plan and option certificates because the Plan provides that the compensation committee's interpretation is conclusive and binding.[3] We note that at least one Delaware court has observed that when a stock option plan vests in a committee the authority to interpret that plan, the committee would be "at liberty to disregard" an interpretation that might be inferred from the plan's terms in favor of other inferences that could be drawn from its terms. *Stemerman v. Ackerman,* 184 A.2d 28, 33 (Del. Ch.1962). This is consistent with holdings by at least three courts in other jurisdictions. *See Weir v. Anaconda Co.,* 773 F.2d 1073, 1078–79 (10th Cir.1985) (applying Kansas law); *McIntyre v. Philadelphia Suburban Corp.,* 90 F.Supp.2d 596, 600 (E.D.Pa.2000); *Openshaw v. HealthSouth Rehab. Corp.,* 710 So.2d 912, 914 (Ala.Civ. App.1997); *but see Ellis v. Emhart Mfg. Co.,* 150 Conn. 501, 191 A.2d 546, 549 (1963) (holding that although a provision in the stock option agreement said that the board of director's interpretation was final, binding, and conclusive, it is against public policy "[t]o permit parties to agree before a dispute arises to submit their differences to the adjudication of one of the parties").

We do not reach Monsanto's alternative argument because the Plan and option certificates unambiguously provide that the sale of Fisher's stock would result in "Termination of Employment" of Fisher employees who remained with that company, and the compensation committee properly applied those provisions. The "Termination of Employment" limited the Fisher employees' rights to exercise stock options.

### III

The Fisher employees also sued on conversion and fraud claims. The court of appeals did not reach those issues, and Monsanto did not raise any arguments regarding those causes of action in this Court. On rehearing, the Fisher employees contend that those claims should be remanded to the court of appeals. We agree.

Although Monsanto argued in its motion for summary judgment that certain elements of the conversion and fraud causes of action were negated as a matter of law because the Plan and option certificates provided that a sale of Fisher's stock would result in the Fisher employees' "Termination of Employment," Monsanto did not make that argument in its briefing in this Court. None of the briefing before us addresses the conversion or fraud claims. The Fisher employees contended in the court of appeals that their fraud and conversion claims should survive even if the stock options expired when Monsanto said that they did. The court of appeals did not reach these issues because it held that the stock options had not expired. We therefore agree with the Fisher em-

---

**3.** The Plan provides:

The Committee shall have the exclusive right to interpret this Incentive Plan.... All acts and decisions of the Committee with respect to any questions arising in connection with the administration and interpretation of this Incentive Plan, including the severability of any and all of the provisions thereof, shall be conclusive, final and binding upon all Eligible Participants.

ployees that the conversion and fraud claims should be remanded to the court of appeals.

Monsanto has asked this Court to adopt section 142 of the Restatement (Second) of Conflicts of Laws and apply Delaware's three-year statute of limitations. But Monsanto did not contend in this Court that the Delaware statute would bar the Fisher employees' conversion or fraud claims, nor did it brief the substance of Delaware limitations law. We therefore should not and do not consider whether to adopt section 142 of the Restatement or how adoption of that section might impact the conversion and fraud claims in this case.

■ The Fisher employees contend in their motion for rehearing that in the trial court they also asserted a cause of action for breach of a duty of good faith and that this Court should remand that claim as well. However, examination of the record reveals that no such claim was asserted. The Fisher employees' ninth amended petition, which was the live pleading on file when the trial court granted Monsanto's motion for summary judgment, used the words "good faith" in asserting a fraud cause of action, but did not assert a separate cause of action for breach of a duty of good faith and fair dealing:

> Defendant's conduct as described herein constitutes a false representation which defendant knew or believed was false, or was made with reckless indifference to the truth thereof, with an intent to induce the plaintiffs to act or refrain from acting, plaintiffs took action in justifiable reliance on the defendant's false representation and have been damaged thereby. Additionally, defendant's failure to administer the Plans in good faith constituted fraud in that its interpretations of the plan were false, or made with reckless indifference to the

correct interpretation, with an intent to induce the plaintiffs to prematurely exercise their options, or not exercise them at all, plaintiffs took such action in justifiable reliance on the defendant's fraudulent interpretation and have been damaged thereby.

Accordingly, there is no "breach of good faith" claim to remand.

\*　　\*　　\*　　\*　　\*　　\*

The sale of Fisher resulted in a "Termination of Employment" of Fisher employees within the meaning of the employee incentive Plan and option certificates at issue in this case. Upon termination of employment, 1) the 1992 option certificates expired, and 2) Fisher employees had limited time periods within which to exercise their 1989, 1990, and 1991 stock options to purchase Monsanto stock. Because Monsanto was entitled to summary judgment on all the employees' breach of contract claims, we reverse the court of appeals' judgment and render judgment for Monsanto on that claim. The Fisher employees' conversion and fraud claims are remanded to the court of appeals.