IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2008

Charles R. Fulbruge III
Clerk

No. 07-50290

GREG KERN

Plaintiff-Appellant

v.

SITEL CORPORATION

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Texas

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Appellant Greg Kern appeals the district court's denial of his motion for summary judgment and the grant of summary judgment for Appellee SITEL Corporation ("SITEL"), in which the district court found the 2003 Sales Compensation Plan ("the Plan") ambiguous and, therefore, subject to SITEL's final interpretive authority. Although we agree with Kern that the Plan is unambiguous, we find that, under Texas law, SITEL retains final interpretive authority under the Plan. Therefore, we AFFIRM.

I.

Kern was hired by SITEL as Vice President, Business Development in June 2003. He received an annual salary of $110,000 with the possibility of

earning an incentive payment based on his sales performance, in accordance with terms outlined in the Plan.  Specifically, the Plan provided that Vice Presidents, Business Development receive incentive compensation for "new SITEL services business sold to new accounts and new SITEL services sold to existing accounts."  Vice Presidents, Business Development were to be compensated for "all SITEL services that are invoiced to clients during the fiscal year . . . ."

Any incentive payment was based on the budgeted target revenue.  If Vice Presidents, Business Development reached 100% of their target revenue, they were entitled to 100% of their incentive payment.  However, if they exceeded their target revenue, they could receive a larger incentive payment–up to 250% of their base salary if their sales were twice their target revenue.

Kern's target revenue goal for the 2004 fiscal year was eight million dollars.  It is undisputed that Kern sold several contracts to Dell USA LP, which generated a total invoiced revenue of $16,846,659.50.  Consequently, Kern achieved sales over twice his target revenue for the year.  Kern argues that this should have entitled him to an incentive payment of $275,000, or 250% of his base salary.  SITEL, however, capped Kern's incentive payment at $150,000 based upon its interpretation of section 20.0 of the Plan.  Kern then brought suit claiming SITEL breached the Plan, seeking $125,000 in additional incentive pay.

The parties filed cross-motions for summary judgment.  Kern argued that section 20.0 of the Plan only placed a cap on the incentive payment a Vice President, Business Development could earn on a single sale contract.  SITEL argued that the cap applied to each client, not to each sale, and that it retained final interpretive authority over any dispute pursuant to section 6.0 of the Plan.  The district court granted SITEL's motion and denied Kern's motion, finding that both parties had presented reasonable interpretations of

the Plan and, therefore, it had to defer to SITEL's interpretation pursuant to section 6.0 of the Plan.

## II.

The district court's grant of summary judgment is reviewed de novo. Gonzalez v. Denning, 394 F.3d 388, 391 (5th Cir. 2004).  It is undisputed that Texas law governs this case.

## III.

In determining Kern's incentive compensation under the Plan, the parties rely heavily on the language of sections 6.0 and 20.0.  These sections provide in pertinent part:

> 6.0    Employer's Rights:
> The Business Unit President and Vice President of Human Resources Representative will resolve disputes over interpretation of any aspects of this plan.  The decision of the Business Unit President shall be final.

> 20.0   Annual Account Contract Payment Limits:
> For all Vice President[s], Business Developments, the maximum incentive payment that can be received in one fiscal year for any one account contract is US$150,000 subject to management review. However, there is no limit to the number of large account contracts that can be sold by any one Vice President, Business Development to any account(s) in one calendar year.

Kern argues that the phrase "one account contract" in section 20.0 unambiguously means one sales contract.  Because "[u]nder Texas law, the interpretation of an unambiguous contract . . . is a legal question," Kern argues that this Court must interpret the Plan.  Steuber Co. v. Hercules, Inc., 646 F.2d 1093, 1098 (5th Cir. 1981).  In other words, Kern argues that SITEL's interpretative powers under section 6.0 cannot be triggered if we find the phrase "one account contract" unambiguous.  In contrast, SITEL argues that section 6.0 unambiguously gives it final interpretation over "any aspect"

of the Plan, including interpretation of the phrase "one account contract." SITEL argues that, under Texas law, its interpretation must stand unless it can be shown that it acted with fraud, in bad faith, or with a grossly mistaken exercise of judgment.

While we agree with Kern's premise that the phrase "one account contract" is unambiguous, we disagree with his conclusion that we may interpret the Plan without regard to SITEL's interpretive powers under section 6.0. Rather, we find that Texas law compels the conclusion that, where an employer retains the right to interpret and change an incentive compensation plan, the employer's interpretation must stand unless the employer acted in bad faith.

A. Section 20.0 is Unambiguous

Under Texas law, "[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). "A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." Id. Courts should "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." Id. Furthermore, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." Id.

SITEL argues that the phrase "one account contract" means one "client." In other words, SITEL argues that this phrase caps the incentive

bonus a Vice President, Business Development can receive on all sales to a particular client.[1]

Kern argues that the phrase "one account contract" caps the incentive bonus a Vice President, Business Development can receive on any one individual sale. He argues that the plain meaning of the phrase "account contract" is a statement of work, which is an individual contract between SITEL and a customer. Under this interpretation, the first sentence of section 20.0 says that the maximum incentive payment for "one account contract" is $150,000, and the second sentence clarifies that there is no limitation on the number of "large account contracts" a Vice President, Business Development may sell to any "account." In other words, section 20.0 means that Vice Presidents, Business Development cannot earn more than a $150,000 incentive payment on any one sale/contract, but there is no limit on the number of sales/contracts they can make to any one client ("account").

Applying Texas principles of contract interpretation, we agree with Kern's argument that his interpretation of section 20.0 is the only reasonable interpretation because SITEL's interpretation–that "one account contract" refers to an individual client–would render the second sentence of section 20.0 meaningless. Under SITEL's interpretation, the first sentence of section 20.0 would mean that Vice Presidents, Business Development cannot earn more than a $150,000 incentive payment from sales to one client. But the second

---

[1] SITEL refers to provisions in the Plan and deposition testimony to show that the primary duty of a Vice President, Business Development is to bring in new clients. Accordingly, SITEL argues, incentive payments should not be uniform between sales to new versus existing clients. We find this argument unpersuasive. First, SITEL's interpretation of section 20.0 sets a cap on the incentive bonus that can be earned per client, not per existing client. A Vice President, Business Development would not be capped if he sold twice his revenue target by selling new services to multiple existing clients. This undercuts SITEL's argument that the incentive structure is designed to award bringing in new clients. Additionally, if section 20.0 was meant to further limit incentives for sales to existing clients, it likely would have explicitly said so, like the many other provisions of the Plan that curtailed incentives for sales to existing clients.

sentence would mean that there is no limit on the number of clients ("account contracts") a Vice President, Business Development can sell on any particular account. This interpretation is not internally coherent. Additionally, the wording "large account contracts that can be sold" is awkward–or even nonsensical–if "account contract" refers to a particular client. SITEL's interpretation reads out the distinction between "account contract" and "account," which appears to be the function of the second sentence. Accordingly, SITEL's interpretation of section 20.0 is unreasonable, and we find the phrase "one account contract" unambiguous.

B. The Effect of Section 6.0

Finding that section 20.0 is unambiguous, Kern argues that SITEL's interpretive rights under section 6.0 are not implicated. Kern relies upon a Texas Supreme Court case, Monsanto v. Boustany, 73 S.W.3d 225 (Tex. 2002). In Monsanto, the Texas Supreme Court interpreted an employee incentive plan and related stock option certificates. The Court found the plan unambiguous in favor of the employer and, therefore, did not reach the employer's alternative argument that the plan gave it the exclusive right to interpret the agreement. Id. at 227, 232. This case does not guide our conclusion for two reasons. First, the Texas Supreme Court in Monsanto was applying Delaware, not Texas, law. Id. at 229. Second, the fact that the Texas Supreme Court did not reach the issue of the employer's interpretive authority–because it already found in favor of the employer based on the plan's language–does not offer us guidance as to how the Court would have decided the issue, if it had determined the need to do so. Id. at 232. Therefore, we find Monsanto inapplicable to this case.

While there are no Texas cases involving interpretation of incentive plan contracts directly on point,[2] we find strong guidance in our prior holding in Marsh v. Greyhound Lines, Inc., 488 F.2d 278 (5th Cir. 1974). In Marsh, a Greyhound bus driver sued Greyhound alleging that the Trustees of the company's pension fund had wrongfully denied him disability retirement benefits due to an injury he incurred on-the-job. Id. at 279. The bus driver won a favorable verdict at trial, but on appeal, this Court reversed and rendered judgment for the company. Id. at 284. Central to this holding was language in the Plan stating that "all decisions of the Trustees in administering the Plan shall be final." Id. at 280 (internal quotation marks omitted). This Court noted that such language did not "accord complete and unbridled discretion to the Trust," but nonetheless found that Texas law required such a provision to be given effect unless there was a showing that the Trustees acted in bad faith. Id. ("Texas law . . . is fairly clear that such a provision is to be given effect by requiring a showing of bad faith before the courts will interfere with a decision of the Trustees."). The logic of Marsh was cited favorably in Golden v. Kentile Floors, Inc., where this Court interpreted a deferred compensation agreement with a similar interpretation clause under New York law. 512 F.2d 838, 847 (5th Cir. 1975) ("Despite their

---

[2] SITEL points this Court to two cases involving interpretation of incentive compensation plans under Texas law, Stinger v. Stewart & Stevenson Servs., Inc., 830 S.W.2d 715, 717 (Tex. App. 1992) (plan provided that "this arrangement may be modified or changed upwards or downwards at any time at the Company's discretion"), and Nichols v. Enterasys Networks, Inc., 2006 WL 1169146, at *1 (S.D. Tex. 2006) (unpublished) (plan provided that "Management reserves the right to make final and binding decisions regarding the amount of compensation earned and paid to any Plan Participant"). We agree with Kern, however, that these cases are distinguishable because the plans in those cases explicitly gave the employer the discretion to adjust compensation. Stinger, 830 S.W.2d at 719 ("The arrangement, therefore, by its own terms, did not represent to promise appellant very much of anything, except that the company promised to pay commissions based on the stated formula unless it determined it did not want to."). Section 6.0 of the Plan at issue here does not provide such discretion; it grants SITEL the right to interpret the Plan, but not the right to determine the amount of compensation at its discretion.

reluctance to interfere with private employment affairs, courts do not step completely aside when the party who would assume the role of sole arbiter, is charged with fraud, bad faith, or a grossly mistaken exercise of judgment. This was the thrust of our holding in Marsh . . . .") (internal citations omitted).

We find that these cases require us, in interpreting the Plan as a whole, to honor SITEL's interpretive rights under section 6.0, so long as SITEL did not act in bad faith. Thus, although SITEL erred in its interpretation of "one account contract" in section 20.0, unless this error was made in bad faith, SITEL retains final interpretive authority over "any aspect" of the Plan, and its determination of Kern's incentive payment must stand.

C. SITEL Did Not Act in Bad Faith

Texas law provides that "bad faith may be established not only by direct evidence, such as evidence of unreasonable requirements, refusal to consider favorable information, or the use of standards more strict than those applied to others similarly situated, but . . . may also be inferred from an adverse decision which has no basis in fact." Marsh, 488 F.2d at 280. Here, Kern argues that SITEL's bad faith can be inferred from it adopting an adverse interpretation of section 20.0 that had no basis in the actual language of the provision. He also notes that SITEL's summary judgment witnesses have previously defined terms in section 20.0 in a manner that supports his interpretation.[3]

In response, SITEL argues that Kern has not put forth evidence to indicate that it acted in bad faith. Importantly, SITEL points to testimony

---

[3] Kern relies upon testimony from SITEL's Chief Operating Officer. However, as stated in section 6.0 of the Plan, SITEL's Business Unit President and Vice President of Human Resources Representative retain interpretive authority over "any aspect" of the Plan. The fact that one SITEL official, who was not familiar with the details of the Plan at issue, agreed with Kern's interpretation does not establish that SITEL acted in bad faith.

stating that it has consistently interpreted section 20.0, including applying the $150,000 cap to another Vice President, Business Development who only sold services to an already existing customer.

We find SITEL's argument persuasive. Although there may be circumstances where an employer's interpretation of an unambiguous contract is so outlandish that it constitutes bad faith, we do not find that to be the case here. Given SITEL's consistent (though erroneous) treatment of section 20.0 in the past by the Business Unit President and Vice President of Human Resources Representative, we do not believe that SITEL acted in bad faith so as to treat Kern differently from others similarly situated. Kern simply does not advance a sufficient rationale to establish that SITEL acted in bad faith.[4] Accordingly, SITEL retains interpretive authority under section 6.0 of the Plan, and we will not interfere with its determination of Kern's incentive compensation.

IV.

In light of the foregoing, the decision of the district court is AFFIRMED.

---

[4] As this Court noted in Golden, we are "fully aware of the evidentiary problems that plaintiffs face in these cases." 512 F.2d at 849. Accordingly, "we have held that fraud or bad faith may be proved circumstantially, as well as directly . . . ." Id. In Golden, the trial court "apparently utilized the device of a procedural presumption in order to shift to the defendant a burden of going forward with exculpatory evidence." Id. "We consider the use of such a trial tool largely a matter within the discretion of the District Judge." Id. However, the procedural presumption "does not shift the burden of proof unless a shift is dictated by an independent rule of law." Id. Therefore, any findings "based on the presumption must still follow logically and naturally from the basic proof in the lawsuit." Id.