# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00632-CV

---

**Nathan Bryan, Appellant**

**v.**

**Human Power of N Company, Appellee**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-002772, THE HONORABLE MARIA CANTÚ HEXSEL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Dr. Nathan Bryan appeals from the trial court's final judgment, challenging the trial court's summary judgment rulings that were incorporated into its final judgment. For the following reasons, we affirm the final judgment.

## BACKGROUND[1]

Dr. Bryan is one of the co-founders, a shareholder, and the former Chief Science Officer of Appellee Human Power of N Company (the Company).[2] The Company is a privately held company that sells products that support or enhance the body's production of nitric oxide.

---

[1] The facts are taken from the summary-judgment evidence.

[2] When originally founded in 2009, the Company's name was NeoGenis Laboratories, Inc., but it changed its name to Human Power of N Company in 2016.

**The Option Plan**

Central to the parties' dispute, Dr. Bryan and other shareholders approved the adoption of a "2013 Non-Qualified Stock Option Plan" (the "Option Plan") for the Company. The Option Plan's purpose "is to provide incentive to directors, consultants, advisors and key employees" of the Company "to continue their association with the Company by providing opportunities for such persons to participate in the ownership of the Company and its future growth, and to offer an additional inducement in obtaining the services of such persons."

The Option Plan provides that it is to be administered by a committee (the "Plan Committee") consisting of the Company's board of directors (the "Board") or individual directors designated by the Board; that the Plan Committee has the "sole and absolute discretion" to make necessary determinations for the administration of the plan; that any controversy or claim relating to the Option Plan or any option agreement thereunder "shall be determined unilaterally by the Committee in its sole discretion"; that "[a]ll decisions, determinations and interpretations of the Committee shall be final, binding, and conclusive on all Optionees"; and that no member of the Plan Committee "shall be liable for any action, failure to act or determination made in good faith with respect to the Plan, any Option Agreement or any Option hereunder."

Under the Option Plan, the Plan Committee in its "sole discretion" may grant stock options, but such stock options must be subject to written option agreements that are consistent with the Option Plan:

> Each Option granted hereunder shall be for such number of shares of Common Stock, and otherwise subject to such terms and conditions, as the Committee shall determine and specify in a written option agreement (an "Option Agreement"), which may be in such form not inconsistent with the Plan as the Committee may

2

determine. Each Option Agreement shall be signed by the Optionee and by a duly authorized officer of the Company.

Paragraph 9 of the Option Plan, however, provides a procedure that authorizes the Plan Committee to restrict an optionee's right to exercise his or her options:

> The Committee may provide a written notice to an Optionee that the Committee believes the Optionee is or has engaged in activity that is materially detrimental to the best interests of the Company and its shareholders. After the Committee provides such notice to the Optionee, the Optionee cannot exercise the Optionee's Option until and unless the Committee notifies the Optionee in writing that the restriction on exercise has lapsed. In determining if the materially detrimental activity has actually occurred and if the restriction on exercise should be removed, the Committee shall consider the facts presented on behalf of the Company and the Optionee. The decision of the Committee as to the materially detrimental nature of the Optionee's activities and the extent of any restriction on exercise shall be final, binding and conclusive.

Pursuant to the Option Plan, Dr. Bryan was granted an option to purchase 47,500 shares of common stock (the "Option") as of July 1, 2013, and the Company's internal records, including its capitalization table, reflected that Option.

**The Controversy**

In 2017, Dr. Bryan was removed as the Chief Science Officer and entered into a consulting agreement with the Company. In 2018, Dr. Bryan asked the Company's Chief Financial Officer (CFO) by email for a copy of his option agreement for the Option and other information, which request was forwarded to the Company's counsel, but Dr. Bryan did not receive a response. The Company through counsel also sent multiple letters to Dr. Bryan and his

3

counsel during 2018, including cease-and-desist letters alleging that he had breached his consulting agreement with the Company and detailing complaints about his conduct.[3]

In the early part of 2019, the parties entered into an amendment to the consulting agreement, which amendment expired in early 2020. The amendment states that Dr. Bryan "desires to be released from a portion of the terms of his non-compete within the Agreement" so he could pursue offering services to non-competitors; that the Company desires the amendment "to address the Company's concerns" about Dr. Bryan's "publication to third parties, whether verbal or in writing, of negative, critical, and disparaging comments by [him] about the Company, its products, and leadership"; and that the Company desires "to enter into an amended written agreement noting [Dr. Bryan's] commitment to be a vocal supporter and advocate for positive support of the Company, its products and leadership."

In February 2020, Dr. Bryan made a written request to examine the Company's books and records. After receiving this request, the Company removed the Option from its internal records, including its capitalization table, and notified Dr. Bryan that it had done so because he had not executed an option agreement as required under the Option Plan. According

---

[3] For example, the summary-judgment evidence includes a nine-page letter from counsel for the Company in February 2018 to Dr. Bryan's counsel. The Company's counsel stated that the letter was in response to a letter from Dr. Bryan's counsel in January 2018 and the allegations raised by Dr. Bryan in that letter. The Company's counsel stated that those allegations were "completely without merit" and described in detail Dr. Bryan's alleged conduct that was a "detriment" to the Company. Another example is a seven-page letter from the Company's counsel to Dr. Bryan's counsel in July 2018 detailing complaints about Dr. Bryan's conduct and demanding that he cease and desist from this conduct.

Both parties were represented by counsel throughout their pre-lawsuit communications. Unless indicated otherwise, communications between Dr. Bryan and the Company were made between counsel.

to the Company, in responding to Dr. Bryan's request to examine the Company's books and records, it discovered that it did not have a signed option agreement with him.

**The Option Agreement and the Restriction of the Option**

On March 2, 2020, Dr. Bryan notified the Company that it had never asked him to sign an option agreement, that the Company and its officers had represented that the Option continued to exist, and that he had relied on these representations. He requested that the Company provide him with an option agreement immediately so he could sign it.

On March 4, the Board held a meeting with no notice to Dr. Bryan and without his presence. The minutes from the meeting reflect that the Board was acting in its capacity as the Plan Committee and recite that: (i) the Board "considered issues raised by" Dr. Bryan and his counsel related to his "assertion that he had rights under an Option Agreement approved by the Company but not signed by [him]"; (ii) the Board "reviewed and discussed various activities of Dr. Bryan which have been the subject of various communications between Dr. Bryan and his counsel and the Company and its counsel"[4]; (iii) the Board determined that Dr. Bryan had taken actions "over at least the past year" that were "materially detrimental" to the best interests of the Company; and (iv) the Board determined that to the extent the Option is determined to have been

---

[4] In particular, the minutes reflect that the Board, acting as the Plan Committee, considered the following actions by Dr. Bryan:

> The Board, acting as the Committee, specifically considered various statements made by Dr. Bryan that were critical of the Company's products and activities; considered the communications that Dr. Bryan had apparently had with Thermolife (which the Committee determined to be detrimental to the Company's interest in connection with pending litigation), Dr. Bryan's claims to be able to use formulas for the manufacture of product using proprietary information belonging to the Company and which are competitive with the Company, as well as other wrongful actions taken by Dr. Bryan that the Committee considered to be adverse to the best interests of the Company.

5

validly granted, which it contested, Dr. Bryan was "prohibited from exercising any such options until and unless the Plan Committee notifies him in writing that it has elected to remove these restrictions on his exercise."

The day after this meeting, the Company provided written notice to Dr. Bryan about the Plan Committee's determination to restrict the Option to the extent it was valid based on his "materially detrimental" actions and advised him that he was prohibited from exercising the Option unless and until the Plan Committee notified him in writing that it had elected to remove the restrictions. The Company also stated that because Dr. Bryan was required to execute an option agreement "for it to become valid and effective (which did not occur)," Dr. Bryan "does not maintain any right, title or interest to such options."

On March 9, Dr. Bryan responded to the Company's March 5 letter. Dr. Bryan's counsel stated that Dr. Bryan was "ready and willing to sign" the same option agreement "as all other Plan participants" and requested copies of Company records, including "documents that evidence any 'activity [by Dr. Bryan] that is materially detrimental to the best interests of [the Company] and its shareholders' as you allege in your March 5, 2020 letter."

On March 18, the Company provided Dr. Bryan with an option agreement concerning the Option for Dr. Bryan's signature (the "Option Agreement"). The Option Agreement had already been executed by the Company and stated that the date of the grant of the Option was July 1, 2013, and set the exercise price per share of common stock; that except as otherwise provided herein, the Option shall be exercised in accordance with the terms and conditions set forth in the Option Plan including Paragraph 9; that the terms of the Option Plan were incorporated herein; that the Option "may be subject to restrictions on exercise upon the

6

occurrence of events specified in Section 9 of the Plan"; and that in case of a conflict, the Option

Agreement controlled.  It also contained the following integration and exclusivity provisions:

> (a)  Amendment.  This Option Agreement, including the Plan, contains the full and complete understanding and agreement of the parties hereto as to the subject matter hereof and may not be modified or amended, nor may any provision hereof be waived, except by further written agreement . . . .  The waiver by either of the parties hereto of any provision hereof in any instance shall not operate as a waiver of any other provision hereof or in any other instance.
>
> * * *
>
> (d)  Exclusive Agreement.  The Optionee hereby acknowledges and agrees that by signing this Option Agreement, the Optionee voluntarily and irrevocably forfeits any and all rights, title, and interests the Optionee has or may have had in, to and under (a) any option agreement, option letter, or other similar document pursuant to which the company may have previously granted, or offered to grant, options in the Company to the Optionee and (b) any oral or written commitment or promise regarding options that the Company may have made to the Optionee, except as to any options that have been previously exercised and paid for by the Optionee.

In the cover letter with the Option Agreement, counsel stated that the agreement was provided without waiver of the Company's position that Dr. Bryan was prohibited from exercising the Option and that the agreement was provided based on his request and his representations that he is "ready and willing" to execute it.  As to the request by Dr. Bryan for documents in the March 9 letter, copies of documents were attached to the letter and the Company's counsel stated:

> As for your request (fifth bullet point) for documents evidencing activity by Dr. Bryan that is materially detrimental to the Company's and its shareholders' best interests, we direct your attention to all prior communications with Dr. Bryan and his lawyers since April 21, 2017 (including without limitation the various cease and desist letters and responses thereto).  More recently, we also direct your attention to Dr. Bryan's communications with Thermolife and Dr. Bryan's September 18, 2018 letter to the Company's board and shareholders regarding negotiations with Thermolife.  Copies [of] those types of communications are attached.

7

The letter also included the following sentence: "Of course, if Dr. Bryan executes the agreement, he will be bound by all of its terms (and those of the Plan), and we trust that you will advise Dr. Bryan of the same." On March 31, Dr. Bryan provided a copy of the fully executed Option Agreement to the Company. The Company restated the Option on its internal records, including its capitalization table.

At a meeting on April 2, the Board, in its capacity as the Plan Committee, reconsidered its decision to restrict Dr. Bryan's options but did not change its decision to prohibit him from exercising the Option. The minutes recite:

> The Board, constituting the Committee under the Company's 2013 Non-Qualified Stock Plan (the "Option Plan"), was requested to reconsider its prior decision to restrict the exercise of stock options to Dr. Nathan Bryan following Dr. Bryan's execution of the Option Agreement following the decision of the Committee on March 4, 2020. Acting as the Committee under the Option Plan, [the Board] reviewed again and discussed the activities of Dr. Bryan which have been the subject of communications between Dr. Bryan and the Company, and reconsidered whether Dr. Bryan's actions over at least the past year, were materially detrimental to the best interests of the Company, whether there had been any change in circumstances from the Committee's consideration of the same issue during its meeting in March, and whether the exercise [by] Dr. Bryan of options granted under the Option Agreement executed by him should be restricted as provided in the Plan. After a review of the information, and determining that there had been no change in circumstances that led to the prior decision to restrict the exercise of options by Dr. Bryan, [the Board] re-confirmed its position that Dr. Bryan has engaged in activity that is materially detrimental to the best interests of [the Company] and its shareholders. Accordingly, pursuant to Paragraph 9 of the Plan, the Board approved a letter to be sent to Dr. Bryan (via counsel) which provided him with notice of the same. In addition, the Board, acting as the Committee under the Option Plan, approved a motion prohibiting Dr. Bryan from exercising any options until and unless the Plan Committee notifies him in writing that it has elected to remove these restrictions on his exercise.

On the same day as this meeting, the Company provided notice to Dr. Bryan that it had received the fully executed Option Agreement, that the Plan Committee "has (once again)

8

determined that Dr. Bryan has engaged in activity that is materially detrimental to the best interests of [the Company] and its shareholders," and that Dr. Bryan was prohibited from exercising the Option until and unless the Plan Committee notified him in writing that it had elected to remove the restrictions from the exercise of the Option.

On May 20, Dr. Bryan attempted to exercise the Option by personally delivering the exercise form and a certified check in the amount of the exercise price for the shares of common stock to the Company's office, but the Company refused to accept the exercise of the Option.

**Litigation Ensued**

The day after Dr. Bryan attempted to exercise the Option, the Company sued Dr. Bryan, seeking declaratory judgment that the Plan Committee's determination concerning Dr. Bryan's "ability to exercise the Option is final, binding, and conclusive"; that Dr. Bryan was "prohibited from exercising the Option" until the Company notified him that the restriction was removed; and that his attempt in May 2020 to exercise the Option was "invalid and ineffective."

Dr. Bryan answered, counterclaimed for breach of contract, and asserted affirmative defenses of promissory estoppel and unclean hands.[5] He alleged that the Company breached the Option Plan and the Option Agreement by failing to timely provide him with a copy of the Option Agreement, by failing to act in good faith in exercising its discretion, and by denying his exercise of the Option based on allegedly "materially detrimental" conduct. He also alleged that he suffered damages from the Company's breach of the agreements.

---

[5] Dr. Bryan also asserted a cause of action concerning his request to inspect the Company's books and records, but he amended his counterclaim to remove that cause of action, and it is not at issue in this appeal.

9

The parties filed motions for summary judgment. In its motion, the Company sought traditional summary judgment on its claims for declaratory judgment, arguing that the undisputed summary-judgment evidence established that the Plan Committee's decision to restrict Dr. Bryan's exercise of the Option "was made without bad faith" and that there was no genuine issue of material fact as to the good faith in that decision. The Company also sought traditional and no-evidence summary judgment on Dr. Bryan's breach-of-contract counterclaim and affirmative defenses, contending that there was no evidence to support his counterclaim or affirmative defenses and that to the extent his counterclaim and affirmative defenses were based on complaints about the Company's alleged promises prior to the execution of the Option Agreement, they were barred as a matter of law based on the Option Agreement's integration and exclusivity provisions. In his motion, Dr. Bryan sought traditional summary judgment on his breach-of-contract counterclaim. The parties also filed responses to the others' motion and summary-judgment evidence that included correspondence between the parties and their counsel leading up to the litigation, the executed Option Agreement, the Option Plan, declarations from Dr. Bryan, deposition excerpts, and discovery responses.[6]

Following a hearing, the trial court granted the Company's motion for summary judgment in part, denied Dr. Bryan's motion, and dismissed his breach-of-contract counterclaim with prejudice. In its order, the trial court ordered that the Company was entitled to judicial declarations that:

> (1) The Company's Option Plan Committee's determination to restrict Dr. Bryan's option exercise is valid, final, binding, and conclusive, (2) unless and until the Company notifies Dr. Bryan in writing that the restrictions on his option exercise have been rescinded or terminated, Dr. Bryan is prohibited from

---

[6] Some of the summary-judgment evidence remains under seal.

exercising his options and the Company shall have no obligation to issue certificates representing Dr. Bryan's exercised option shares or otherwise comply with any obligation under the executed option agreement or option plan concerning Dr. Bryan's attempted exercise of his options, and (3) Dr. Bryan's attempted May 20, 2020, exercise of his options is invalid and ineffective.

After the parties entered a "Stipulation Regarding Final Judgment" as to attorney's fees and costs, the trial court signed its final judgment, which incorporated its summary judgment rulings and awarded attorney's fees and costs to the Company.[7] This appeal followed.

## ANALYSIS

In three issues, Dr. Bryan argues that the trial court erred in entering the Company's requested declarations and dismissing his breach-of-contact counterclaim because of genuine issues of material fact as to those claims and his affirmative defenses of promissory estoppel and unclean hands and because the Company failed to conclusively establish its affirmative defenses of failure to mitigate and waiver.

### Standards of Review

We review the trial court's summary judgment rulings de novo. *Zive v. Sandberg*, 644 S.W.3d 169, 173 (Tex. 2022); *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004); *see Hawkins v. El Paso First Health Plans, Inc.*, 214 S.W.3d 709, 719 (Tex. App.—

---

[7] After the trial court's summary judgment ruling, Dr. Bryan filed a motion for leave to file an amended petition to add a fraud claim, filed a separate lawsuit against the Company and three individuals asserting a fraud claim based on alleged conduct by the Company and its current and former officers, and sought to consolidate the two cases. The trial court denied Dr. Bryan's motions for leave to file an amended petition and to consolidate the two cases, and Dr. Bryan has not appealed those rulings. Because Dr. Bryan's pleadings in this case do not include a fraud claim against the Company or his separate pending fraud suit, we expressly do not consider such a claim here.

Austin 2007, pet. denied) (explaining that because trial court determined declaratory-judgment issue on summary judgment, appellate court reviews propriety of declarations under same standards as apply to summary judgments). Under this standard, we view "the evidence in the light most favorable to the non-movant, crediting evidence favorable to the non-movant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Zive*, 644 S.W.3d at 173 (citing *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019)).

To prevail on a traditional motion for summary judgment, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). A movant seeking a no-evidence summary judgment must assert that "there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). "The court must grant the motion unless the respondent produces summary-judgment evidence raising a genuine issue of material fact" on the challenged elements. *Id.*; *see JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006).

"A genuine issue of material fact exists if it 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "The evidence does not create an issue of material fact if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (quoting *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014)).

12

When the trial court does not specify the grounds for its summary judgment, as is the case here, the appellate court must affirm the summary judgment "if any of the theories presented to the trial court and preserved for appellate review are meritorious." *Knott*, 128 S.W.3d at 216. Further, when both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, we consider the summary-judgment evidence presented by both sides, determine all questions presented and, if we determine that the trial court erred, render the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (citing *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000)).

Dr. Bryan's issues also involve matters of contract construction. "If a written contract is so worded that it can be given a definite or certain legal meaning when so considered and as applied to the matter in dispute, then it is not ambiguous." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 765 (Tex. 2018). Whether a contract is ambiguous is a legal question for the court. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). "A contract is not ambiguous simply because the parties disagree over its meaning." *Id.* In this case, because the relevant provisions in the Option Agreement and Option Plan can be given a definite or certain legal meaning when considered and applied to the parties' dispute, we conclude that they are not ambiguous. *See URI, Inc.*, 543 S.W.3d at 765.

The construction of an unambiguous contract is also a question of law that we review de novo.[8] *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). We generally interpret language within a contract according to its "plain, ordinary, and generally accepted meaning."

---

[8] In contrast, when an agreement as written is ambiguous, the parties' intent becomes a fact issue. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).

13

*Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 742–43 (Tex. 2020) (quoting *URI*, 543 S.W.3d at 764). Our primary concern is to ascertain and give effect to the intent of the parties as expressed in the document. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005) (per curiam). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999) ("When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless."). With these standards in mind, we turn to Dr. Bryan's issues.

**Declaratory Judgment and Breach-of-Contract Counterclaim**

In his first issue, Dr. Bryan argues that the trial court erred in entering the Company's requested declarations and dismissing his breach-of-contact counterclaim because the evidence conclusively established his counterclaim or, at a minimum, there are genuine issues of material fact.

Generally, "[t]he essential elements of a breach-of-contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Here, however, the Option Agreement provides "sole discretion" to the Plan Committee to "determine unilaterally" any claim arising under the Option Plan and that "[a]ll decisions, determinations, and interpretations of the Committee shall be final, binding, and conclusive on all Optionees." In this context, bad faith by the Company is also an

14

essential element of Dr. Bryan's breach-of-contract counterclaim. *See Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 153 (Tex. App.—Texarkana 1988, writ denied) (stating that "[b]ad faith becomes essential element of a breach of contract claim only when the contract places performance solely and absolutely in the discretion of one party" and that in that situation, "recovery can only be had if the party exercised its discretion in bad faith"); *see also Gibson v. STP Nuclear Operating Co.*, No. 13-11-00089-CV, 2012 Tex. App. LEXIS 1899, at *12 (Tex. App.—Corpus Christi–Edinburg Mar. 8, 2012, no pet.) (mem. op.) (stating that "[w]here an employer retains the right to interpret an incentive compensation plan, the employer's interpretation must stand, absent bad faith on the part of the employer" (citing *Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008))); *Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 648 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (collecting and discussing authorities holding that only way to attack employer's determinations that are stated to be final under employer-funded plan is by showing bad faith or fraud in employer's actions).

Dr. Bryan contends that, at a minimum, he presented at least a scintilla of evidence that: (i) the Option Plan and the Option Agreement are valid existing contracts; (ii) under those contracts, the Company owed Dr. Bryan duties, including the duty to deliver a copy of the Option Agreement to him; (iii) he exercised the Option for shares as required under the Option Plan and Option Agreement; (iv) the Company breached the terms of the Option Plan and Option Agreement; and (v) he suffered damages as a result of the Company's breaches. He alleges that, at a minimum, fact issues exist as to whether he exercised the Option as required by the Option Agreement and Option Plan; whether the Company breached the agreement by failing

15

to timely send him a copy of the Option Agreement[9]; whether the Company breached the agreement by failing to exercise good faith or reasonableness in exercising its discretion to restrict the exercise of the Option and denying his exercise of the Option based on alleged "materially detrimental" conduct; and whether he suffered damages because he was unable to exercise the "valuable" Option for shares.

The parties agree that the Option Agreement is a valid and binding contract. Dr. Bryan also appears to contend that the Option Plan is a stand-alone contract and that the Company had an implied duty under its terms to deliver a copy of an option agreement to him to sign but that it failed to do so and that this failure "cannot be said to have been taken in good faith." *See HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 888–89 (Tex. 1998) (explaining that "covenant will not be implied unless it appears from the express terms of the contract that 'it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it,' and therefore they omitted to do so, or 'it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument'" (quoting *Danciger Oil & Ref. Co. v. Powell*, 154 S.W.2d 632, 635 (Tex. 1941)).

The Option Plan, however, was not a stand-alone contract between the Company and Dr. Bryan. The elements of a "valid and binding contract" include a "meeting of the minds," "each party's consent to terms," and "execution and delivery." *See Adcock v. Five Star Rentals/Sales, Inc.*, No. 04-17-00531-CV, 2018 Tex. App. LEXIS 2690, *4 (Tex. App.—San Antonio Apr. 18, 2018, no pet.) (mem. op.) (citing *Specialty Select Care Ctr. of San Antonio,*

---

[9] The evidence was disputed as to whether the Company had provided an option agreement to Dr. Bryan prior to 2020, but for purposes of this appeal, we take as true Dr. Bryan's evidence that the Company did not provide him with an option agreement until March 2020. *See Zive v. Sandberg*, 644 S.W.3d 169, 173 (Tex. 2022) (reviewing evidence in light most favorable to nonmovant).

*L.L.C. v. Owen*, 499 S.W.3d 37, 43 (Tex. App.—San Antonio 2016, no pet.))). The Option Plan does not satisfy these elements. For example, it provides that the Plan Committee in its sole discretion may grant options to such eligible directors, employees, or other persons as it shall determine; that it is authorized to determine the terms and conditions of an option agreement consistent with the plan; and that each option agreement shall be signed by the optionee and an authorized officer of the Company. It also provides that options that are granted pursuant to the plan shall be "subject to terms and conditions as the Committee shall determine and specify in a written option agreement," and it does not contain a form option agreement, a date or time when an option agreement must be provided or executed, or identify the eligible directors, employees or other persons who may receive options under the plan. Thus, because the Option Plan is not a stand-alone contract, Dr. Bryan has not raised a fact issue as to whether the Company breached the Option Plan, such as by failing to deliver an option agreement to him before the Company provided the Option Agreement. *See Valero Mktg.*, 51 S.W.3d at 351 (including existence of valid contract among elements of breach-of-contract claim).

It follows that Dr. Bryan's breach-of-contract counterclaim required him to establish that the Company breached the Option Agreement, the valid and existing agreement between the parties. *See id.* And although the Option Plan was not a stand-alone contract, its terms were incorporated into the Option Agreement. *See Zapata Corp. v. McIntyre*, No. 14-99-00900-CV, 2001 Tex. App. LEXIS 1765, at *12–13 (Tex. App.—Houston [14th Dist.] Mar. 15, 2001, pet. denied) (mem. op.) (concluding that agreement was subject to terms and conditions of stock option plan). In this context, by signing the Option Agreement in March 2020, Bryan expressly agreed to be subject to the terms of the Option Plan, including that the Plan Committee could restrict the exercise of the Option and that the Plan Committee's

17

determination to restrict the Option would be "final, binding, and conclusive." Paragraph 9 of the Option Plan, which term was incorporated into the Option Agreement, expressly provides that the Plan Committee may provide notice to an optionee that it "believes the Optionee is or had engaged in activity that is materially detrimental to the best interests of the Company and its shareholders," *see Black's Law Dictionary* 175 (9th ed. 2009) (defining "believe" to mean "[t]o feel certain about the truth of; to accept as true"), and that its decision "as to the materially detrimental nature of the Optionee's activities and the extent of any restriction on exercise shall be final, binding, and conclusive."

Dr. Bryan also expressly waived certain rights, title, and interests that he had or may have had when he executed the Option Agreement by agreeing that he:

> voluntarily and irrevocably forfeited any and all rights, title, and interests the Optionee has or may have had in, to and under (a) any option agreement, option letter, or other similar document pursuant to which the Company may have previously granted, or offered to grant, options in the Company to the Optionee and (b) any oral or written commitment or promise regarding options that the Company may have made to the Optionee, except as to any options that have been previously exercised and paid for by the Optionee.

*See Jernigan v. Langley*, 111 S.W.3d 153, 157 (Tex. 2003) (defining "waiver" as "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right" (quoting *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987))). And he agreed that the Option Agreement was the "full and complete understanding and agreement of the parties hereto as to the subject matter hereof" and that the Option became "effective as of the date an executed copy [was] delivered by the Company to the Optionee."[10]

---

[10] The Option Agreement also states directly above the parties' signature line on the last page that "the parties have executed this Option Agreement as of _____, 2016, to be effective on the date first written above." In his reply brief, Dr. Bryan argues that the waiver

18

We must enforce these unambiguous provisions as written. *See Biko v. Siemens Corp.*, 246 S.W.3d 148, 161–62 (Tex. App.—Dallas 2007, pet. denied) ("By entering into an unambiguous agreement with a merger clause, the signing appellants have foreclosed their reliance on prior agreements and their use of parol evidence to contradict the agreement's objective language." (citing *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 666 (Tex. App—Dallas 2004, pet. denied))); *see also Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 795–800 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (discussing provision in agreement stating that contract represented parties' entire agreement and superseded prior written or oral representations and barring consideration of evidence of alleged oral agreement based on parol evidence rule); *COC Servs.*, 150 S.W.3d at 666 (explaining that courts enforce unambiguous instruments as written, including provisions "stating that all previous agreements between the parties are merged, or integrated, into the subject writing").

"When a contract contains a merger or integration clause, the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence." *Prince v. Weleba*, No. 02-23-00085-CV, 2023 Tex. App.

provision only applies to bar complaints existing before the effective date of the Option Agreement of July 1, 2013, because that date is the first date that is referred to in the Option Agreement: "Date of Grant of Option ('date hereof'): July 1, 2013." Dr. Bryan, however, did not raise this argument with the trial court or in his opening brief and, thus, we do not consider it on appeal. *See* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); Tex. R. App. P. 38.1(f) (requiring appellant's opening brief to "state concisely all issues or points presented for review"). Further, although it is not clear the date the parties were referring in the last page of the agreement, the evidence established that the Company provided the Option Agreement to Dr. Bryan in March 2020 and that he executed and returned it to the Company shortly after receiving it, and the Option Agreement expressly states: "This Option shall be effective as of the date an executed copy is delivered by the Company to the Optionee."

19

LEXIS 7644, at *15–16 (Tex. App.—Fort Worth Oct. 5, 2023, no pet.) (mem. op.) (citing *Barker v. Roelke*, 105 S.W.3d 75, 83 (Tex. App.—Eastland 2003, pet. denied)). Thus, applying the plain language of the above recited integration and exclusivity provisions, we conclude that to the extent that Dr. Bryan alleges that the Company breached the Option Agreement by failing to timely send it to him prior to March 2020, he has waived this allegation. *See id.*; *Biko*, 246 S.W.3d at 161–62.

The remaining ground for Dr. Bryan's breach-of-contract counterclaim is his allegation that the Plan Committee did not act in good faith when it restricted his ability to exercise his options in 2020, and it was Dr. Bryan's burden to present evidence to raise a fact issue as to this allegation. *See Zapata Corp.*, 2001 Tex. App. LEXIS 1765, at *17 (concluding that committee's decision was final and binding when employee did not allege bad faith or fraud in refusing to award stock options); *Lone Star Steel Co.*, 759 S.W.2d at 153; *see also Gibson*, 2012 Tex. App. LEXIS 1899, at *12; *Macy*, 294 S.W.3d at 648. As a preliminary matter, we observe that to the extent Dr. Bryan relies on alleged promises or representations by the Company's officers, such as the capitalization table, that occurred prior to the Option Agreement's execution to raise a fact issue as to the Plan Committee's good faith in restricting his options, he expressly waived these allegations under the integration and exclusivity provisions.[11] Thus, we limit our review to Dr. Bryan's allegations of the Company's actions after the parties executed the Option Agreement in March 2020.

---

[11] For example, the summary-judgment evidence also includes Dr. Bryan's declaration that he "sought to exercise [his] options by at least 2018 when [he] requested [his] option documents from [the Company's CFO]." As stated above, the evidence of Dr. Bryan's request in 2018 could not create a fact issue here because of the Option Agreement's integration and exclusivity provisions. Moreover, he did not sign an Option Agreement until 2020, requesting a copy is not the same as exercising an option, and without an executed option agreement,

20

A person acts in "good faith" when he has a "state of mind consisting in" "honesty in belief and purpose" or the "absence of intent to defraud or to seek unconscionable advantage." *See Black's* at 762. A person acts in bad faith when he has "[d]ishonesty of belief or purpose." *See id.* at 159; *Goudie v. HNG Oil Co.*, 711 S.W.2d 716, 720 (Tex. App.—El Paso 1986, writ ref'd n.r.e.) (stating that "bad faith implies actual or constructive fraud, or a design to mislead or deceive another and that bad faith does not result from an honest mistake as to one's rights or duties, but by some interested or sinister motive"); *see, e.g.*, *Kern*, 517 F.3d at 311 (explaining that under Texas law, bad faith may be established by direct evidence of "unreasonable requirements, refusal to consider favorable information or the use of standards more strict than those applied to others similarly situated" or that bad faith "may be inferred from an adverse decision which has no basis in fact" (citation omitted)); *Bobbora v. Unitrin Ins. Servs.*, 255 S.W.3d 331, 336 (Tex. App.—Dallas 2008, no pet.) (discussing definition of "good faith" and "bad faith" in surety and indemnification context and requirement in some contexts to show improper motive or willful ignorance of facts to establish "bad faith"); *Dynacq Healthcare, Inc. v. Seth*, No. 01-06-00188-CV, 2007 Tex. App. LEXIS 5451, at *13 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (mem. op.) (declining to interpret incentive plan and stock option agreement that gave company's committee or board sole discretion to approve method of payment to exercise stock option to allow company to refuse request to exercise stock option in certain way "just because").

---

Dr. Bryan was not entitled to exercise options before he received the Option Agreement in March 2020.

Dr. Bryan argues that the Company did not act in good faith because it failed to consider evidence presented on his behalf pursuant to Paragraph 9 of the Option Plan, which provides:

> In determining if the materially detrimental activity has actually occurred and if the restriction on exercise should be removed, the Committee shall consider the facts presented on behalf of the Company and the Optionee.

Dr. Bryan complains that he was not provided notice of the meetings or given an opportunity to present facts and argues that there was "no record of any person presenting any information, or any information being presented by anyone, on behalf of Dr. Bryan." In his declaration, Dr. Bryan declared that he "was never at any time asked by the Company, or given an opportunity by the Company, to present facts to the Option Committee that made the determination to prohibit [him] from exercising [his] options."[12] Dr. Bryan also disputes the Plan Committee's belief that his activities were materially detrimental to the Company, relying on evidence that the Company was thriving financially during the relevant time and the lack of evidence from a financial perspective of how his complained-of conduct damaged the Company, and argues that the Company failed to provide any explanation for how his conduct was materially detrimental or what standard or evidence was used to make this determination.

Paragraph 9, however, does not dictate the standard or evidence to be used in making a materially detrimental activity determination and there is no requirement in Paragraph 9 that the Plan Committee provide notice to an optionee, that an optionee be present at a meeting

---

[12] In addition to his declaration, Dr. Bryan relies on the deposition testimony from a Company officer that Dr. Bryan was not present at the meeting, that he did not recall the Board providing notice to Dr. Bryan of the meeting, and that Dr. Bryan did not have an opportunity to respond prior to the March meeting. The officer was asked, "The [B]oard did not allow Nathan Bryan to present his side of the issue; correct?" The officer answered, "He had an opportunity to respond; but prior to [the March] meeting, no."

before a determination is made to restrict his options, that the optionee or someone designated by the optionee be given the opportunity to present facts on the optionee's behalf, or that the facts be presented orally or in any particular way. *See Neuhoff Bros. Packers Mgmt. Corp. v. Wilson*, 453 S.W.2d 472, 474–75 (Tex. 1970) (observing that profit sharing plan delegated to committee power to determine whether discharge was based on dishonesty and that committee's consultation with attorney and failure to hold hearing for employee was not evidence of lack of good faith, especially because there was no evidence that employee requested hearing). We also observe that when the above recited sentence is considered in the context of Paragraph 9 as a whole, it makes clear that the requirement to consider facts presented on behalf of an optionee is after the Plan Committee has notified the optionee that his or her options have been restricted and when it is considering whether to remove restrictions that are already in place.[13]

The summary-judgment evidence shows that the Plan Committee considered Dr. Bryan's position as to his complained-of conduct and that the Company provided Dr. Bryan with an explanation of the reasons that the Plan Committee believed that his conduct was materially detrimental. *See Macy*, 294 S.W.3d at 649 (concluding that there was no fact issue of bad faith because there was no evidence that the company did not comply with agreement's terms). The summary-judgment evidence establishes that the Company provided written notice

---

[13] The above recited sentence is the third sentence in Paragraph 9, and the first two sentences of Paragraph 9 state:

> The Committee may provide a written notice to an Optionee that the Committee believes the Optionee is or has engaged in activity that is materially detrimental to the best interests of the Company and its shareholders. After the Committee provides such notice to the Optionee, the Optionee cannot exercise the Optionee's Option until and unless the Committee notifies the Optionee in writing that the restriction on exercise has lapsed.

to Dr. Bryan after it made its determination to restrict his options. The minutes from the March meeting recite the Committee's stated reasons for its initial determination that included "various statements made by Dr. Bryan that were critical of the Company's products and activities," "communications that Dr. Bryan had apparently had with Thermolife (which the Committee determined to be detrimental to the Company's interest in connection with pending litigation)," and his "claims to be able to use formulas for the manufacture of product using proprietary information belonging to the Company and which are competitive with the Company." In the March 18 cover letter accompanying the Option Agreement, the Company's counsel referenced Dr. Bryan's request for documents as to the Plan Committee's determination; directed their attention "to all prior communications with Dr. Bryan and his lawyers since April 21, 2017 (including without limitation the various cease and desist letters and responses thereto)" and "Dr. Bryan's communications with Thermolife and Dr. Bryan's September 18, 2018 letter to the Company's board and shareholders regarding negotiations with Thermolife"; and attached "those types of communications."

The summary-judgment evidence also includes copies of the cease-and-desist letters outlining the Company's concerns with Dr. Bryan's activities in 2018 and 2019 and the April 2020 minutes, which reflect the Committee's stated reasons for leaving the restrictions on Dr. Bryan's options in place after Dr. Bryan executed and returned the Option Agreement and after receiving communications from his counsel. The April minutes reflect that the Committee was asked to reconsider its determination that Dr. Bryan's actions had been materially detrimental to the best interests of the Company and that when it again reviewed and considered the activities of Dr. Bryan in April, it considered communications between Dr. Bryan and the Company. There also is no evidence that Dr. Bryan requested a hearing or attempted to present

24

contrary evidence for the Plan Committee's reconsideration. *See Wilson*, 453 S.W.2d at 475. Whether the Plan Committee's beliefs about Dr. Bryan's activities were actually correct does not raise a fact issue about its good faith. *See Goudie*, 711 S.W.2d at 720 (observing that "bad faith" implies "a design to mislead or deceive another and that bad faith does not result from an honest mistake as to one's rights or duties"); *see also Black's* at 175 (defining "believe").

Dr. Bryan argues that the Plan Committee's stated reasons were pretextual, that the Company "purposefully and intentionally withheld" the Option Agreement from him, and that the Company treated him differently from others. He relies on deposition testimony of the CFO that he was unaware of any optionee not receiving their option agreement during his tenure and deposition testimony of an optionee, who exercised a single option in 2018 from the options he received under the Option Plan. The optionee testified that he did not have the exercise form that was attached to his option agreement with him "at the time," that he requested a copy of the form from the CFO at the time, and that the CFO provided the form to him.[14] Dr. Bryan, however, does not cite, and we have not found, evidence that would support that the Plan Committee had a reason to believe that this optionee was or had acted in a materially detrimental way to the Company's interests. Further, when requested in 2020, the Company provided the Option Agreement to Dr. Bryan.

We also observe that Dr. Bryan's conclusory statements about his subjective beliefs do not create a fact issue as to whether the Plan Committee did not act in good faith in

---

[14] Specifically, the optionee who exercised the single option in 2018 testified:

As part of the Option Agreement, on the last page is a form that you sign to exercise. It's an example form. I didn't have that with me at the time. I requested a copy of that form, I believe, [from the CFO] at the time to get that form so that I could exercise that option.

25

restricting his shares.  *See Texas Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) (observing that "subjective beliefs are no more than conclusions and are not competent summary judgment evidence"); *Gibson*, 2012 Tex. App. LEXIS 1899, at \*13 (holding that employer established that employee was not entitled to benefits and that employee's conclusory statement of subjective belief was not sufficient to raise fact issue).  Thus, we conclude that the evidence did not raise a fact issue as to whether the Plan Committee failed to act in good faith when it restricted Dr. Bryan's stock options in 2020.

For these reasons, we overrule Dr. Bryan's first issue.[15]

**Promissory Estoppel and Unclean Hands**

In his third issue, Dr. Bryan argues that there is a fact issue as to his asserted affirmative defenses of promissory estoppel and unclean hands.  He argues that there is a fact issue as to whether the Company can rely on its own discretion to deny Dr. Bryan's right to exercise the Option for shares when it misled him about the existence of the Option to keep him working for the Company, such as by repeatedly showing him the capitalization table that reflected the Option.  He argues that there are fact issues, at a minimum, as to whether the Company promised that he could exercise the Option and whether Dr. Bryan relied on those promises.  The summary-judgment evidence included Dr. Bryan's declarations that he was specifically told by officers of the Company that he could exercise the Option of the 47,500 shares that were shown on the capitalization table; that he relied on these representations;

---

[15] Because we conclude that the summary-judgment evidence does not raise a fact issue as to whether the Company breached the Option Agreement on the ground that the Plan Committee's determination to restrict his shares was not made in good faith, we need not address the Company's additional ground for summary judgment based on the lack of evidence of damages. *See Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

and that if he had been told he could not exercise the Option, he would never have agreed to the consulting agreement or its amendment.

When responding to a motion for summary judgment by way of an affirmative defense, the mere raising of an affirmative defense will not prevent the granting of a summary judgment unless there is competent summary-judgment evidence to raise a fact issue on each element of that defense. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984). The elements of promissory estoppel are: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *see Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 899 (Tex. App.—San Antonio 2002, no pet.) (listing elements of promissory estoppel and explaining that it "is not applicable to a promise covered by a valid contract between the parties"). "The doctrine of unclean hands applies to a litigant whose own conduct in connection with the same matter or transaction has been unconscientious, unjust, marked by a want of good faith or violates the principles of equity and righteous dealing." *City of Fredericksburg v. Bopp*, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.).[16]

---

[16] For purposes of our analysis, we assume that the affirmative defense of unclean hands can preclude a declaratory judgment claim. *But see* Tex. Civ. Prac. & Rem. Code § 37.002(b) (providing for remedy of declaratory judgment to "settle and to afford relief from uncertainty and insecurity with respect to [certain] rights, status, and other legal relations"); *Madhavan A. Pisharodi, M.D., P.A. v. United Biologics, L.L.C.*, No. 04-18-00324-CV, 2020 Tex. App. LEXIS 2460, at *16 (Tex. App.—San Antonio Mar. 25, 2020, pet. denied) (mem. op.) ("'Unclean hands' is an affirmative defense available when the plaintiff is seeking an *equitable* remedy." (quoting *In re Nolle*, 265 S.W.3d 487, 494 (Tex. App.—Houston [1st Dist.] 2008, no pet.))); *accord Cantu v. Guerra & Moore, LLP*, 448 S.W.3d 485, 496 (Tex. App.—San Antonio 2014, pet. denied) ("Unclean hands is an affirmative defense that may bar a party with unclean hands from obtaining equitable relief."); *Furr v. Hall*, 553 S.W.2d 666, 672 (Tex. App.—Amarillo 1977, writ ref'd n.r.e.) ("[T]he 'clean hands' maxim is strictly an equitable doctrine not applicable outside equitable proceedings.").

In our analysis above, we have concluded that Dr. Bryan's evidence did not raise a fact issue as to whether the Plan Committee failed to act in good faith in restricting the Option. Further, by signing the Option Agreement in March 2020, Dr. Bryan expressly waived "any and all rights, title, and interests" he had under "any oral or written commitment or promise regarding options that the Company may have made to [him]," except for options that had been previously exercised and paid for by him. Thus, he may not rely on pre-execution alleged promises by officers of the Company about the Option to create a fact issue. *See Jernigan*, 111 S.W.3d at 157; *Biko*, 246 S.W.3d at 161–62. Applying the applicable standards, we conclude that there is no competent summary-judgment evidence to raise a fact issue on at least one of the elements of Dr. Bryan's affirmative defenses. *See Brownlee*, 665 S.W.2d at 112. We overrule Dr. Bryan's third issue.

**The Company's Affirmative Defenses**

In his second issue, Dr. Bryan argues that the Company failed to conclusively establish its affirmative defenses to his breach-of-contract counterclaim. He argues that there is no evidence that he failed to mitigate his damages and that he did not surrender or waive his right to exercise the Option by executing the Option Agreement.

The Company did not address the mitigation of damages in its motion for summary judgment, but based on our analysis above concerning the provisions in the Option Agreement and our conclusion that the trial court did not err in granting summary judgment in favor of the Company because Dr. Bryan did not raise a fact issue as to whether the Plan Committee did not act in good faith in its determination to restrict the Option, we need not

28

further address the Company's affirmative defenses to Dr. Bryan's counterclaim. *See Knott*, 128 S.W.3d at 216. On this basis, we overrule Dr. Bryan's third issue.

### CONCLUSION

Having overruled Dr. Bryan's issues, we affirm the trial court's final judgment.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed:   February 23, 2024